## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 25-cv-0798-WJM-KAS

PIERCE SPINELLI,

      Plaintiff,

v.

SCOTT BYARS, Detective, in his individual capacity,
CITY OF BOULDER, COLORADO, and
MICHELLE SUDANO, Deputy District Attorney, in her individual capacity,

      Defendants.

---

## ORDER GRANTING MOTION TO DISMISS

---

Before the Court is Defendant Michelle Sudano's motion to dismiss ("Motion") Plaintiff Pierce Spinelli's amended complaint. (ECF Nos. 22, 29.) The Motion is fully briefed. (ECF Nos. 43, 46, 48, 49.) For the following reasons, the Motion is granted.

### I.     FACTUAL BACKGROUND[1]

The following factual background is drawn from the amended complaint. (ECF Nos. 22, 43.) The Court assumes the truth of these facts for the purpose of resolving the Motion. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

In September 2022, Anastasia Behrens accused Spinelli of sexually assaulting her. (ECF No. 22 at 10.) During initial interviews with law enforcement, she described the alleged assault as occurring in two parts: in the first, she expressly rejected Spinelli's attempt to initiate sex; in the second, which occurred a couple of minutes later,

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

the two had consensual sex.  (*Id.*)  That is, Behrens did not report in these initial

interviews that she had rejected Spinelli's advances during the second part of the

incident.  (*Id.*)

The prosecution charged Spinelli in state court with one count of felony sexual

assault.  (*Id.* at 45.)  In March 2023, a county court judge dismissed the charge for lack

of probable cause after a preliminary hearing.  (*Id.* at 53.)  "[I]mmediately after the

preliminary hearing," Behrens called Sudano, the deputy district attorney assigned to

the case, and Defendant Detective Scott Byars to voice her disagreement with what

defense counsel had said at the preliminary hearing, to accuse the county court judge of

being biased, and to begin "discussing options."  (*Id.* at 55.)  Behrens "asked if there

was an appeal process," to which either Sudano or Byars "mentioned" the option of

presenting the case to a grand jury "and how she could come in for a second interview

to clear up the details."  (*Id.* at 54, 55.)  Later that evening, Behrens texted Byars that

she was dismayed by the dismissal.  (*Id.* at 53–54.)  Byars replied, "It is very awful this

took place.  I know Michelle [Sudano] will work hard on the appeal . . . ."  (*Id.* at 54.)

Behrens expressed her gratitude and said she had "a meeting on Friday with Ms.

Sudano."  (*Id.*)  Byars responded, "I am aware of the meeting, [Sudano] and I are

working together to move forward . . . ."  (*Id.*)

Behrens's meeting with Sudano occurred a few days later, during which they

discussed "many things" and "Sudano emboldened Ms. Behrens to report a new version

of the alleged sexual assault that was directly responsive to [the county judge's]

reasons for dismissal."  (*Id.* at 55, 78.)  Sudano then "instructed" Behrens to reach out to

Byars for "additional questioning" at the police station.  (*Id.* at 78.)  Behrens did just that.

(*Id.*)  During that meeting, Behrens reported "for the first time that she had been 'verbally explicit' with Mr. Spinelli and 'continued to tell him no' during the second part of their sexual encounter . . . ."  (ECF No. 43 at 5.)  She added, "Obviously, I see this thing as one continuous event.  It's not two separate things."  (ECF No. 22 at 57.)

A few weeks later, Sudano presented Behrens's "newly fabricated version of her allegations" to a grand jury through testimony from Byars.  (ECF No. 43 at 5.)  Byars testified that Spinelli "penetrated Ms. Behrens's vagina 'as she was still protesting'; that their entire sexual encounter on September 1, 2022, was 'one singular incident'; and that Ms. Behrens 'continue[d] to verbally tell [Mr. Spinelli], No,' after he rolled over to the side and then resumed sexual advances a couple of minutes later . . . ."  (*Id.* at 6.)  Byars "told the grand jury that Ms. Behrens told Mr. Spinelli no 'after the [two-minute] break as well,' which Ms. Sudano knew was false."  (*Id.*)  And Sudano and Byars "chose to put words into Ms. Behrens' mouth that she'd never said at all, telling the grand jury at one point that Ms. Behrens had continued to say no after sexual penetration, which Ms. Behrens had never reported to anyone, not even during her 'additional questioning' on March 21, 2023."  (*Id.*)

The grand jury indicted Spinelli with the same felony sexual assault charge the county court judge had dismissed about two weeks earlier.  (*Id.*)  In June 2024, however, the state trial court dismissed the charge on the prosecution's motion, two business days before trial was set to begin.  (ECF No. 22 at 63.)  Spinelli did not learn of the post-preliminary hearing meetings between Sudano, Byars, and Behrens until "[t]hree days before the dismissal."  (*Id.* at 64.)

Spinelli now brings two 42 U.S.C. § 1983 claims against Sudano: fabrication of

evidence and conspiracy to fabricate evidence in violation of his Fourth and Fourteenth

Amendment rights.  (*Id.* at 78–79.)

## II.    DISMISSAL STANDARD

Under Rule 12(b)(6), "[d]ismissal is appropriate only if the complaint, viewed in

the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is

plausible on its face."  *United States ex rel. Conner v. Salina Regional Health Center,*

*Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotations and citations omitted).  A

claim is plausible on its face "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007)).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully."  *Id.* (citing *Twombly*, *supra*).

Although a plaintiff need not provide "detailed factual allegations" to survive a

motion to dismiss, they must provide more than mere "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555;

*see also Iqbal*, 556 U.S. at 149 (a complaint will not suffice "if it tenders naked

assertions devoid of further factual enhancement") (cleaned up).  Furthermore,

conclusory allegations are "not entitled to the assumption of truth."  *Ashcroft*, 556 U.S.

at 149.  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience

and common sense."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct," the complaint

has made an allegation, "but it has not shown that the pleader is entitled to relief."  *Id.*
(quotation marks and citation omitted).

"The Tenth Circuit has made clear that questions of immunity should be resolved
at the earliest stages of litigation."  *Casias v. City of Pueblo*, 2021 WL 11449170, at *2
(D. Colo. Mar. 10, 2021) (citing *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir.
2012)).

## III.    ANALYSIS

Sudano contends that Spinelli's fabrication of evidence and conspiracy to
fabricate evidence claims fail for three reasons: (1) she is absolutely immune from
liability because her alleged misconduct—meeting with Behrens after the preliminary
hearing to discuss "many things," directing Behrens to contact Byars for "additional
questioning," "emboldening" Behrens to revise her allegations against Spinelli, and
presenting that false evidence to the grand jury—occurred during the course of her work
as an advocate; (2) Spinelli cannot show that Sudano's alleged conduct was
conscience-shocking, as is required to prove a due process claim; and (3) to the extent
Sudano's alleged misconduct occurred while she was performing an investigatory or
administrative function, she is entitled to qualified immunity.  (ECF No. 29 at 5, 9, 11.)
The Court concludes that absolute immunity covers at least some of Sudano's alleged
conduct.  It further concludes that Spinelli's remaining allegations, as presently
presented, do not state a viable claim for relief.

The Court begins by addressing absolute immunity.  The Tenth Circuit has
provided the following comprehensive overview of the law governing absolute immunity
with respect to prosecutors:

'Absolute prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983.' *Mink v. Suthers*, 482 F.3d 1244, 1251 (10th Cir. 2007) (citing *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). In *Imbler*, the Supreme Court had its 'first opportunity to address the § 1983 liability of a state prosecuting officer.' 424 U.S. at 420, 96 S.Ct. 984. Absolute immunity was recognized for a prosecutor's activities that are 'intimately associated with the judicial phase of the criminal process.' *Id.* at 430, 96 S.Ct. 984. Guided by the immunity historically conferred at common law and the interests behind it, the Court focused on the adverse impact of unfounded litigation on 'the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.' *Id.* at 427-28, 96 S.Ct. 984; *accord Burns v. Reed*, 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (explaining absolute immunity applies to prosecutors because the "substantial likelihood of vexatious litigation . . . might have an untoward effect on the independence of the prosecutor"). As *Imbler* and its progeny establish, absolute prosecutorial immunity is intended to protect the judicial process, not the prosecutor. *See Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (quoting *Imbler*, 424 U.S. at 439, 96 S.Ct. 984) ("[T]he absolute immunity of public prosecutors was 'based on the policy of protecting the judicial process.'"); *Malley v. Briggs*, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (explaining absolute immunity is conferred "not from an exaggerated esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself").

Since *Imbler*, the Supreme Court has prescribed, and we have followed, a 'functional approach' to absolute prosecutorial immunity. *Bledsoe v. Vanderbilt*, 934 F.3d 1112, 1117 (10th Cir. 2019) (quoting *Burns*, 500 U.S. at 478, 111 S.Ct. 1934; *see also Briscoe*, 460 U.S. at 342, 103 S.Ct. 1108 ("[O]ur cases clearly indicate that immunity analysis rests on functional categories, not on the status of the defendant."). Under the functional approach, we 'look to which role the prosecutor is performing' at the time of the challenged conduct, *Mink*, 482 F.3d at 1262, and examine 'the nature of the function performed, not the identity of the actor who performed it,' *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

When assessing whether the prosecutor is performing a
function 'intimately associated with the judicial phase of the
criminal process,' *Imbler*, 424 U.S. at 430, 96 S.Ct. 984, we
apply a 'continuum-based approach' and the 'more distant a
function is from the judicial process, the less likely absolute
immunity will attach,'" *Mink*, 482 F.3d at 1261 (citation
omitted).  We begin with an obvious benchmark: a
prosecutor is absolutely immune when functioning 'within the
scope of his duties in initiating and pursuing a criminal
prosecution.'  *Imbler*, 424 U.S. at 410, 96 S.Ct. 984.  By
'initiating and presenting the government's case,' the
prosecutor is cast in 'the role of an advocate.'  *Mink*, 482
F.3d at 1261.  As we have summarized, 'Prosecutors are
entitled to absolute immunity for their decisions to prosecute,
their investigatory or evidence-gathering actions, their
evaluation of evidence, their determination of whether
probable cause exists, and their determination of what
information to show the court.'  *Nielander v. Bd. of Cnty.
Comm'rs*, 582 F.3d 1155, 1164 (10th Cir. 2009).

'The doctrine of absolute immunity, however, is not without
limits.'  *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).
Absolute prosecutorial immunity is justified 'only for actions
that are connected with the prosecutor's role in judicial
proceedings, not for every litigation-inducing conduct.'
*Burns*, 500 U.S. at 494, 111 S.Ct. 1934.  We will not extend
absolute immunity when a prosecutor functions 'in the role of
an administrator or investigative officer rather than that of
advocate.'  *Mink*, 482 F.3d at 1259 (emphasis omitted)
(quoting *Imbler*, 424 U.S. at 430-31, 96 S.Ct. 984.  The
public policy considerations that support the protection of
prosecutorial functions are not applicable to investigative
and administrative acts.  *See Thomas v. Kaven*, 765 F.3d
1183, 1193 (10th Cir. 2014) ("Absolute immunity extends
only so far as is necessary to protect the judicial process.").

For example, when a prosecutor conducts investigative work
normally performed by the police, they are not performing a
prosecutorial function.  *See Buckley v. Fitzsimmons*, 509
U.S. 259, 273–74, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).
'Although identifying those acts entitled to absolute immunity
is not always easy, the determinative factor is 'advocacy'
because that is the prosecutor's main function . . . ."  *Rex v.
Teeples*, 753 F.2d 840, 843 (10th Cir. 1985); *see also
Adams v. Hanson*, 656 F.3d 397, 403 (6th Cir. 2011) ("The

> analytical key to prosecutorial immunity, therefore, is
> advocacy—whether the actions in question are those of an
> advocate.") (citation omitted).

*Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1208–09 (10th Cir. 2022) (footnotes omitted).

As this summary illustrates, "there is no bright line between advocacy and investigation."  *Mink*, 482 F.3d at 1261.  While "it is clear that a prosecutor's courtroom conduct falls on the advocacy side of the line," "it is equally clear that advocacy is not limited to filing criminal charges or arguing in the courtroom."  *Id.*  To aid district courts in determining where a prosecutor's conduct falls along this blurry line, the Tenth Circuit has directed courts to evaluate the following factors, "especially when considering pre-indictment acts": "(1) whether the action is closely associated with the judicial process, (2) whether it is a uniquely prosecutorial function, and (3) whether it requires the exercise of professional judgment."  *Masters v. Gilmore*, 663 F.Supp.2d 1027, 1039 (D. Colo. 2009) (quoting *Mink*, 482 F.3d at 1261).

Applying these principles, the Court concludes that certain portions of Sudano's alleged conduct are undoubtedly covered by absolute immunity.  Specifically, Sudano is absolutely immune for allegedly presenting false evidence to the grand jury.  That conduct fits comfortably within the category of conduct the Tenth Circuit has determined to be entitled to absolute immunity.  *See Mink*, 482 F.3d at 1261 ("[I]t is clear that a prosecutor's courtroom conduct falls on the advocacy side of the line . . . ."); *see also Glaser v. City & Cnty. of Denver, Colo.*, 557 F. App'x 689, 705 (10th Cir. 2014) ("A prosecutor's statements in the courtroom and in pleadings that are relevant to the subject matter of the proceeding are likewise absolutely immune."); *Chilcoat*, 41 F.4th at

1210–11 ("The alleged misrepresentations here were made as part of traditional courtroom advocacy during a preliminary hearing; therefore, Prosecutor Laws is entitled to absolute prosecutorial immunity even if the statements were false.").

Spinelli does not argue otherwise, conceding in his response that his allegations "do not center on [Sudano's] presentation of 'statements to the grand jury' or her use of fabricated evidence 'at the grand jury' proceedings."  (ECF No. 43 at 7 (emphases omitted).)  "Instead," Spinelli clarifies, his allegations "primarily concern her conduct in the days immediately following the dismissal [of the charge before the county court judge], in the window of time between the preliminary hearing on March 13, 2023, and the grand jury proceedings on March 30, 2023."  (*Id.* at 7–8.)  That is, Spinelli's claims are based on his allegations that Sudano

- met with Behrens to "clear up the details";

- discussed "next options" with Behrens after the preliminary hearing, including bringing the case to a grand jury;

- was "working together" with Byars to "move forward" with Spinelli's prosecution;

- "instructed" Behrens to reach out to Byars for "additional questioning";

- "emboldened" Behrens to revise her allegations in response to the county court judge's finding of no probable cause at the preliminary hearing; and

- conducted these meetings with Behrens and Byars in secrecy.

(*Id.* at 8–9.)

Whether this alleged conduct is covered by absolute immunity presents a more difficult question.  On the one hand, meeting with a witness to "clear up details" and

directing them to meet with a detective for "additional questioning"—all for the purpose

of presenting that revised testimony to a grand jury—strikes the Court as being closely

associated with a prosecutor's work in initiating a judicial process. *See Mink*, 482 F.3d

at 1261 (instructing district courts to consider "whether the action is closely associated

with the judicial process").  This view is bolstered by the Colorado Rules of Criminal

Procedure, which expressly contemplate a prosecutor's use of the grand jury vehicle to

pursue a prosecution after a charge has been dismissed for lack of probable cause at a

preliminary hearing.  *See* Crim. P. 5(a)(4)(IV) ("Upon a finding of no probable cause, the

prosecution may appeal pursuant to Rule 5(a)(4)(V), file a direct information pursuant to

Rule 5(a)(4)(VI) charging the same offense(s), *or submit the matter to a grand jury*, but

may not file a subsequent felony complaint charging the same offenses.") (emphasis

added); *see also People v. Noline*, 917 P.2d 1256, 1257 (Colo. 1996) (explaining that

prosecutors may pursue grand jury presentment after a court's dismissal for lack of

probable cause).

The timing of this conduct also seems to support a finding of absolute immunity.

Sudano allegedly began discussing appeal options with Behrens over the phone—at

*Behrens's* behest—"immediately" after the preliminary hearing.  Sudano then met with

Behrens only a few days later.  And the grand jury proceedings took place a few weeks

thereafter.  This relatively short sequence of events stands in stark contrast to the

circumstances in which other courts have found a prosecutor to be acting as a detective

scouring for new evidence long before the criminal process had begun instead of a

lawyer evaluating preexisting evidence.  *See Buckley*, 509 U.S. at 263 (concluding that

prosecutors were not absolutely immune for allegedly collaborating with an

anthropologist "well known for her willingness to fabricate unreliable expert testimony" after the prosecution had failed "to make a reliable connection between the print and a pair of boots that petitioner had voluntarily supplied"); *see also Glaser*, 557 F. App'x at 705 (concluding that prosecutors were not immune for "publish[ing] false information about [Glaser] online and t[elling] his business associates not to work with him" long after the criminal proceedings had temporarily ended); *Mink*, 482 F.3d at 1262 (concluding that prosecutor who reviewed a search warrant application as part of a continuing effort to obtain evidence—when the district attorney was far from filing charges—was not entitled to absolute prosecutorial immunity); *Masters*, 663 F.Supp.2d at 1047 (concluding that prosecutor was not immune where she began allegedly manufacturing evidence "4–5 months prior to the arrest of Mr. Masters, at which time there was no probable cause for his arrest"); *Bledsoe*, 934 F.3d at 1118 (concluding that prosecutor who "fabricated evidence against [plaintiff] *during the preliminary investigation* of C.A.'s murder" was not entitled to immunity) (emphasis added).

On the other hand, Sudano's call and subsequent meeting with Behrens—during which Sudano allegedly "emboldened" Behrens to change her story—occurred *after* the county court judge found no probable cause to support the sexual assault charge. The United States Supreme Court has declared that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993). This strongly supports Spinelli's position that Sudano was performing an investigative, rather than prosecutorial, function. *See Glaser*, 557 F. App'x at 705 (discerning no absolute immunity where prosecutors allegedly fabricated evidence "for the purpose of

establishing probable cause").

Moreover, meeting with a witness after an adverse preliminary hearing ruling to "embolden" them to tailor their testimony in response to a judge's reasoning for dismissing a charge is not "a uniquely prosecutorial function." *Mink*, 482 F.3d at 1261. A detective could do this work just the same. *See Buckley*, 509 U.S. at 273 (explaining that acts protected by absolute immunity "must include the professional evaluation *of the evidence assembled by the police* and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made") (emphasis added). Tellingly, a detective *did* that work in this case: After their meeting, Sudano instructed Behrens to reach out to Byars for "additional questioning," which took place at the police station shortly thereafter.[2]

At any rate, the Court need not decide this thorny immunity issue to resolve the Motion. This is because, even assuming absolute immunity (or qualified immunity, for that matter) does not insulate Sudano for allegedly meeting with and "emboldening" Behrens to concoct new allegations, these allegations fail to state a fabrication of evidence claim.

To state a fabrication of evidence claim, a plaintiff must allege that "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against

_____

[2] Whether "emboldening" a witness to revise their testimony "require[s] the exercise of professional judgment" presents yet another murky question. *Mink*, 482 F.3d at 1261. This action, again, may resemble the work of a detective trying to manufacture evidence for the purpose of creating probable cause. *See Glaser*, 557 F. App'x at 705 (discerning no absolute immunity where prosecutors allegedly fabricated evidence "for the purpose of establishing probable cause"). But the Court also acknowledges that ascertaining whether a witness's testimony amounts to the existence of probable cause seems to necessitate performing a legal analysis, which is in the province of a lawyer.

the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021).  In this Circuit, where the alleged fabrication of evidence was performed by a member of the executive branch, like the former deputy district attorney here, the Court "can only find a due process violation where the conduct 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"  *Hall v. Brown*, 2023 WL 7014046, at *6 (10th Cir. Oct. 25, 2023) (citing *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1190 (10th Cir. 2020)).

A review of the Tenth Circuit's *Warnick v. Cooley* decision shows why Spinelli's accusations do not state a fabrication of evidence claim.  895 F.3d 746 (10th Cir. 2018). There, Daniel Herboldsheimer, a deputy peace officer, pursued a criminal defendant after he attempted to flee from a courtroom. *Id.* at 749.  Herboldsheimer then prepared an incident report on the matter. *Id.*  Silvan Warnick, Herboldsheimer's boss, accused him of filing an incident report that "did not comport with county policy because it contained hearsay observations from others, and not Herboldsheimer's direct observations." *Id.* at 749.  Offended by this accusation, Herboldsheimer contacted the local district attorney's office and falsely reported that Warnick "had instructed him to falsify his incident report." *Id.*  He also "told the prosecutors that Warnick had made changes to his report—something he took to be falsification." *Id.*  The prosecutors twice filed charges against Warnick, but the cases were ultimately dismissed for lack of probable cause. *Id.*

Warnick sued the prosecutors for fabricating evidence, alleging that "the

prosecutors and investigators together conducted an inadequate investigation even though they had a duty to investigate."  *Id.*  Warnick also claimed that "the prosecutors 'encourage[d]' Herboldsheimer to provide 'false information,' and that "[a]ll the parties involved 'knew or should have known that the information provided by . . . Herboldsheimer was false and that Plaintiff Silvan Warnick had not committed a crime.'"  *Id.*  The district court dismissed Warnick's claims in full.  *Id.* at 750.

The Tenth Circuit affirmed the district court's dismissal of the fabrication of evidence claim, explaining that Warnick's "bare statements" against the prosecutors

> do not amount to a plausible claim of a constitutional violation.  *The crux of Warnick's complaint about the investigation is that the prosecutors encouraged Herboldsheimer to provide false information.*  Evidence fabrication could, of course, violate Warnick's Fourth Amendment rights.  *See Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).  *But Warnick does not tell us what the fabricated statements were—not in his complaint, nor in his briefing, nor even when asked at oral argument.  Recall that according to Warnick's own complaint, it was Herboldsheimer who contacted the prosecutors alleging that Warnick had falsified the report.  That means the prosecutors could not have fabricated those general allegations.*  We are thus left to ponder what false statements Warnick might be referring to.  So too, are we left wondering what specific acts each individual prosecutor engaged in.
>
> The prosecutors cannot reasonably respond to such a conclusory assertion of misdeeds.  *See, e.g., Robbins v. Oklahoma*, 519 F.3d 1242, 1247–48 (10th Cir. 2008).  *And without any specific factual allegations, Warnick's complaint simply cannot cross the line from a merely possible claim of evidence fabrication to a plausible one.  See Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).  Indeed, if the prosecutors did fabricate evidence, they either did not use that evidence against Warnick, or else were surely incapable fabricators—unable even to convince the judge they crossed the not-so-high bar of probable cause.

*Id.* at 752–53 (emphases added).

*Warnick's* analysis applies with equal force to the allegations asserted here. To recap, the *Warnick* panel discerned an insufficient fabrication of evidence claim where the plaintiff (1) alleged that the prosecutors "encouraged" Herboldsheimer to "provide false information"; (2) did not specify what the prosecutors had encouraged Herboldsheimer to say; and (3) alleged that it was Herboldsheimer who originally approached the prosecutors, not the other way around. *Id.*

The circumstances here are materially similar. First, Spinelli's theory of his fabrication of evidence claim is that Sudano secretly met with Behrens in the absence of probable cause and "emboldened" her "to report a new version of the alleged sexual assault that was directly responsive to [the county judge's] reasons for dismissal"—or, in other words, "to provide false information." *Id.* at 752. The Court sees no meaningful difference between a prosecutor "encouraging" (as alleged in *Warnick*) or "emboldening" (as alleged here) a witness to lie. Both words are capacious and could mean any number of things (as described momentarily).

Second, Spinelli does not tell the Court what Sudano's fabricated statements actually are. He says that Sudano "emboldened" Behrens to revise her account of the alleged sexual assault, but the word "emboldened" is too vague and nebulous to have an objectively definitive meaning in this context. The Court does not know whether Sudano allegedly "emboldened" Behrens by merely comforting her, educating her about the legal standards at issue, talking through the night of the alleged incident to try to jog her memory, feeding her the precise facts to allege in the new interview with Byars, or

something else.  Spinelli does not say.[3]  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("[P]lausibility . . . must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible.") (quotations omitted); *see also Iqbal*, 556 U.S. at 129 (while a complaint need not show that the alleged misconduct probably happened, it must show more than that the alleged misconduct merely possibly happened).

Third, just like in *Warnick*, it was *Behrens* who reached out to Sudano to initiate meeting and pursuing "next steps."  "That means the prosecutors could not have fabricated those general allegations."  *Id.*; *see also id.* at 753 ("[W]ithout any specific factual allegations, Warnick's complaint simply cannot cross the line from a merely possible claim of evidence fabrication to a plausible one.").  Thus, the Court concludes that *Warnick* compels dismissal of Spinelli's fabrication of evidence claim.

The Court is not persuaded otherwise by Spinelli's assertion that *Warnick* is distinguishable because it "involved so few, bare, and internally inconsistent factual allegations related to the alleged constitutional violation that the court held it was impossible to determine what false statements the plaintiff alleged were fabricated and by whom."  (ECF No. 43 at 14.)  As explained, the Court sees Spinelli's allegations as being substantially similar to Warnick's, at least insofar as they lack necessary detail.

---

[3] Spinelli uses vague language to describe Sudano's alleged conduct even in his surreply.  There, he insists that it is "reasonable to infer that Ms. Sudano and Ms. Behrens must have discussed new, substantive allegations against Mr. Spinelli."  (ECF No. 49 at 9.)  But merely "discussing" such allegations does not plausibly indicate that Behrens fabricated evidence.  It therefore appears that Spinelli does not know what Sudano actually said and did in her meeting with Behrens.

This raises another significant deficiency with the allegations set forth in the amended complaint: They do not shock the conscience in a constitutional sense.  To reiterate, allegations that Sudano secretly met with Behrens after the preliminary hearing to discuss "many things"; directed Behrens to contact Byars for "additional questioning"; "emboldened" Behrens to revise her allegations against Spinelli; and "worked together" with Byars to further pursue the criminal prosecution are weak, vague, and threadbare.

Resisting this conclusion, Spinelli tries to liken this case to *Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2023), but his attempt to do so is unavailing.  That case involved the criminal prosecution of a husband who was accused of shooting and killing his wife. *Id.* at 1233.  The husband averred that his wife shot herself, but he was nonetheless initially convicted of murder after the prosecution elicited testimony from a medical examiner that the wife's cause of death was a homicide.  *Id.* at 1233.  This testimony was obtained on false pretenses, however, after the prosecutor provided the medical examiner with false evidence indicating that the wife had moved seven feet after being shot—a distance not possible for someone who died by suicide.  *Id.*  After being acquitted of the murder charge on retrial, the husband alleged that the prosecutor "intentionally presented false information to the medical examiner to get him to change [the wife's] manner of death to homicide and then put the medical examiner on the stand to testify based on that false information in order to secure [the husband's] conviction."  In this situation, the Tenth Circuit concluded that the husband's "allegations paint a picture of arbitrary executive action that shocks the conscience . . . ."  *Id.* at 1239.

17

This situation is different.  Alleging that a prosecutor "emboldened" (which could mean any number of things) an alleged sexual assault victim to change her testimony is a far cry from a prosecutor "providing a medical examiner materially false information that influences his expert opinion as to whether a homicide occurred."  *Id.* at 1240; *cf. Pierce v. Gilchrist*, 359 F.3d 1279, 1283–84 (10th Cir. 2004) (concluding that forensic chemist's conduct of knowingly falsifying findings pertaining to hair samples at a rape crime scene for the purpose of securing a conviction was not protected by qualified immunity).  Simply put, the Court does not perceive conduct that shocks the conscience in the amended complaint, which is fatal to Spinelli's fabrication of evidence claim. *Crowson*, 983 F.3d at 1190.

For all these reasons, the Court dismisses Spinelli's fabrication of evidence claim.  And because Spinelli cannot state a fabrication of evidence claim, he necessarily cannot plead a conspiracy to fabricate evidence claim either.  *See Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017) ("To state a conspiracy claim under § 1983, a plaintiff must plead that he was deprived of a constitutional right.").

## IV.    LEAVE TO AMEND

Spinelli fails to state a section 1983 claim based in part on absolute immunity and Fed. R. Civ. P. 12(b)(6).  And he does not ask the Court for leave to file an amended complaint in the event the Court reaches the result it has.  Nevertheless, the Court will give him an opportunity to move for leave to amend to try to remedy the defects in his pleading, should he believe that he has more specific allegations to allege.  *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).  The Court cautions Spinelli, however, that he should only file such a motion if he has a good faith basis to believe that he has

specific factual allegations identifying in greater detail what Sudano did and how her actions deprived him of a constitutional right.  *Robbins*, 519 F.3d at 1249–50. Generalized and conclusory statements are not sufficient to state a claim for relief. *Twombly*, 550 U.S. at 555.

Spinelli must file his motion for leave to file a second amended complaint by November 3, 2025.  If Spinelli does not file such a motion by that time, final dismissal of this action will enter without further notice.

## V.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.    The Motion is GRANTED.  (ECF No. 29.)

2.    Spinelli's amended complaint (ECF No. 22) is DISMISSED WITHOUT PREJUDICE.  (ECF No. 22.)

3.    Spinelli is GRANTED LEAVE to file a motion for leave to file a second amended complaint by no later than **November 3, 2025**.


Dated this 7th day of October, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge